# EXHIBIT 1

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND**

**IN THE MATTER OF AN ARBITRATION**

BETWEEN:

**DH-DHEKELIA SHIPMANAGEMENT LIMITED**

Claimant

- and -

**(1) BLUESTONE COAL SALES CORPORATION**     First Respondent
**(2) BLUESTONE RESOURCES INC**     Second Respondent

**MV "ELENA VE"**

Charterparty dated 04.11.2020

_____

**FINAL ARBITRATION AWARD**
_____

**Background**

1.  Pursuant to a voyage charter on an amended Gencon 1994 form with additional rider clauses ("the Rider"), evidenced by a clean fixture recap dated 4 November 2020 ("the Recap"), collectively the charterparty ("the Charterparty"), Owners DH-Dhekelia Shipmanagement Limited of Cyprus ("the Claimant") entered into a fixture for the carriage of a cargo of coal from Norfolk, USA to Gdansk or Swinoujscie, Poland with a loading laycan of 5-15 December 2020. The party named as Charterers in the Recap was Bluestone Coal Sales Corporation of USA ("the First Respondent")

1

**Constitution of the Tribunal**

2.    The Charterparty contained the following arbitration provisions, collectively the Arbitration Agreement :

**Recap 16/Clause 43**

*"Jurisdiction: London Maritime Arbitrators Association (LMAA) English law to apply."*

**Gencon 1994 Form**

**Box 25**

"London Maritime Arbitrators Association (LMAA)  English Law to apply"

*"19. Law and Arbitration*

*"(a) This Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of this Charter Party shall be referred to Arbitration in London in accordance with the Arbitration Act 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force.  Unless the parties  agree upon a sole arbitrator, one arbitrator shall be appointed by each party and the arbitrators so appointed shall appoint a third arbitrator, the decision of the three-man tribunal thus constituted or any two of them, shall be final.  On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days failing which the decision of the single arbitrator appointed shall be final."*

3.    Disputes arose between the Claimant and the First and Second Respondents in respect of delays at the loadport and failure to load a cargo.  On 5 March 2021 the Claimant appointed the undersigned Alan Oakley of Holkham House, Madigan Place, Bishop's Stortford, Hertfordshire, CM23 5FH as its arbitrator and commenced arbitration against the Respondents, calling upon them to appoint a second arbitrator.  The Respondents duly appointed the undersigned Miss Daniella Horton of 20-22 Wenlock Road, London N1 7GU on 25 March 2021.

4.    Pursuant to the Arbitration Agreement, the Parties agreed that the law applicable to this arbitration is English law, the procedural rules to apply to the reference are the LMAA Terms 2017 and that the seat of the arbitration is London, England.

5.    The Claimant was represented by MFB Solicitors of London, UK.  The First and Second Respondents were represented by Aaron B. Houchens, P.C. of USA.

**Procedural Matters**

6.      On 26 April 2021 the Claimant served Claim submissions seeking the sum of USD 922,015.23, alternatively USD 1,027,504.03, together with interest and costs against the First Respondent as the Charterers named in the Recap and against the Second Respondent as undisclosed principal.   On 26 May 2021 the First and Second Respondents served submissions in reply, in which the First Respondent denied the Claimant's claims and in which the Second Respondent objected to our jurisdiction, denying that it was a party to the Charterparty.   The Second Respondent also served a separate Objection to Jurisdiction which we deal with below.   In response on 16 June 2021 the Claimant served Reply submissions maintaining its claims against both of the Respondents and maintaining that we had jurisdiction over the Second Respondent.

7.      Having exchanged LMAA Questionnaires in July 2021, the Parties were in agreement as regards the nature of the evidential stages required, namely standard (and if needed, specific) disclosure, witness and expert evidence.   However, being unable to agree on the appropriate procedural timetable, we made procedural directions in relation to those stages of the arbitration.

8.      In September 2021 the Claimant made an extensive specific disclosure application, in reply to which the First Respondent agreed to disclose certain of the documents requested, whilst the balance remained in dispute.   In October we therefore determined which of the disputed documents sought should be disclosed.

9.      In January 2022, ultimately by agreement, the Claimant served Amended Claim submissions in which it revised upwards the amounts claimed to USD 932,355.93, alternatively USD 1,037,844.73 and it withdrew its claim against the Second Respondent.

10.     Thereafter, the Parties having agreed that we should proceed to our determination on the documents, without an oral hearing, the Parties agreed a timetable for

service of Closing submissions.  Those Closing submissions were served in May, June and August 2022.

11.     Being in agreement, pursuant to paragraph 8(b) of the LMAA Terms 2017 it was not necessary for us, the two party-appointed arbitrators, to appoint a third arbitrator. We accordingly proceeded to our Award, as originally constituted as a Tribunal of two, on the basis of the documents before us.

**Objection to Jurisdiction**

12.     In reply to the Claimant's Claim submissions, the Second Respondent served an Objection to Jurisdiction stating that because it was not a party to the Charterparty, that there was therefore no valid arbitration agreement existing between the Second Respondent and the Claimant, such that the Tribunal lacked jurisdiction over it. More particularly, the Second Respondent submitted that, on the Claimant's own case, it had contracted with the First Respondent, that invoices had been submitted to the First Respondent and that there were no legally operative facts which connected the First and Second Respondent which might support making the Second Respondent a party to the arbitration.  Rather, as a matter of English law, pursuant to the general principle that only parties to an arbitration agreement are bound by that agreement to arbitrate and any award would only be effective against such parties, the Second Respondent sought dismissal of the Claimant's claim against it.

13.     The Claimant addressed the Second Respondent's Objection to Jurisdiction in its Reply submissions.   However, in circumstances where the Claimant itself then subsequently withdrew its claim against the Second Respondent in its Amended Claim submissions, we do not need to consider the Parties' positions on our jurisdiction over the Second Respondent further.

14.     Rather we record that the Claimant's case against the Second Respondent was withdrawn during the course of this reference, leaving the First Respondent as the sole respondent in the arbitration.

**Factual Background**

15.    The Vessel was fixed on 4 November 2021 with a laycan of 5-15 December 2021.
       According to the nomination correspondence, on 23 November 2020 the Claimant
       originally nominated the vessel MV SAKIZAYA POWER with a laycan *"NORFOLK 10/17*
       *NOV"*.  It is not clear whether this was a typographical error intended to read 10/17
       DEC.  In any event, the First Respondent replied that the laycan for the cargo was 21-
       31 December 2020.  The Claimant subsequently nominated and the First Respondent
       accepted on 13 December 2021 the vessel MV ELENA VE ("the Vessel") with a laycan
       30 December 2020–6 January 2021, making it clear at this point that the Vessel
       needed to be in port by the 7th.  The following day the First Respondent confirmed
       the laycan, requesting *"pls speed up the vsl need to have her in Norfolk as early as possible.*
       *Pls confirm as u mentioned before speed will be at least 14 knots."*

16.    The documents before us show the Vessel tendered NOR at 2035 LT on 3 January
       2021 on arrival at Cape Henry sea pilot station of the US port Newport News, picked
       up a pilot there and subsequently anchored at Cape Charles anchorage, where NOR
       was re-tendered at 2240 the same day.  In line with the information contained in the
       Agents' daily reports, the cargo quantity referred to in the NOR, based on the First
       Respondent's instructions, was for 60,000 mt of coal instead of the Charterparty
       quantity of *"70,000 Metric Tons, 10% more or less in Owners' option"*.   The agency
       correspondence confirms that the Claimant accepted this and did not intend to seek
       deadfreight from the First Respondent in this regard.

17.    The loadport SOF records that the Vessel remained at Cape Charles anchorage from
       3 January 2021 *"awaiting cargo availability and terminal berthing instructions"*.   The
       contemporaneous correspondence shows that the Claimant made enquiries
       regarding the cargo availability through the Agents from the outset.  From around 12
       January 2021 the Claimant started to express concern in correspondence regarding
       the availability of the intended cargo and the fact that the Vessel remained idle,
       while the Agents sought payment of additional port DA, given the extent of the delay
       to the Vessel and the continued putting back of the Vessel's berthing prospects.  On

13 January 2021 the Claimant issued an invoice for demurrage up to 18 January 2021 of USD 195,877.78.  On 20 and 28 January 2021 the Second Respondent, on behalf of the First Respondent, made two payments totalling USD 199,980, whilst in parallel on 28 January 2021, the Claimant issued an updated invoice, acknowledging the payments received and indicating a balance due to it of USD 155,897.78 in respect of demurrage up to 28 January 2021.  On 8 February 2021 the Claimant issued a further updated invoice indicating a balance due to it in respect of demurrage to that date of USD 331,897.78 and on 11 February 2021 the Claimant issued a further updated invoice indicating a balance due to it in respect of demurrage to that date of USD 379,897.78.  No further invoices were issued by the Claimant after this date and no further payments were made by either the First or the Second Respondent.

18.  It is common ground that the cargo was not in the port or available to load on the Vessel's arrival, despite the previously anticipated urgency by the First Respondent. Rather, it is apparent from the contemporaneous correspondence that the cargo was at a third party location, where it needed to be loaded onto trains in order to be brought to the port for loading.  Despite assurances to the contrary received through various channels on, amongst other dates, 18 January, 26 January, 4 February and 11 February 2021, the cargo never arrived in the port.  In the meantime, because of the length of time the Vessel had remained idle at port, the USCG notified the Claimant on 29 January 2021 that the Vessel must leave port by 12 February 2021.

19.  Although its legal effect is disputed, it is also common ground that on 11 February 2021 the First Respondent sent a message to the Claimant ("the Cancellation Message") which stated we "*officially release*[s] *you today from the charter vessel of our cargo*".  The following day, on 12 February 2021, the Vessel weighed anchor and shifted to Sewell's Point anchorage.  The Vessel then bunkered there on 14 February 2021, before dropping last sea pilot at Cape Henry Pilot Station at 1835 that day.  On the basis of the documents before us, the Vessel thus departed the loadport without having loaded the intended coal cargo or any other cargo.

20.   Although we have not seen any supporting correspondence, we are told that the Claimant attempted to negotiate early redelivery of the Vessel with head owners at this stage, without success.  We are similarly not told anything of the Vessel's movements or activity after departing the loadport on 14 February 2021.  However, the contemporaneous broking correspondence shows the Vessel being offered in the market between 16 and 23 February 2021.  The documents before us then show that the Vessel was subsequently fixed on 24 February 2021 for the carriage of another coal cargo from Norfolk, USA to Rotterdam, Netherlands with a laycan of 9-18 March 2021 ("the Substitute Fixture").  Under that fixture the Vessel tendered NOR at Cape Henry Sea Pilot Station on 9 March 2021 to load a cargo of 66,000 mt of coal.

21.   In the interim at 0723 on 5 March 2021 the Claimant accepted the Cancellation Message as wrongful repudiation of the Charter.

**The Claimant's Claims**

22.   As a result of the First and/or the Second Respondent's alleged repudiation of the Charter, the Claimant claimed (i) demurrage for the time lost between the date of the Vessel's arrival under the Charterparty on 3 January 2021 until its alleged termination of the Charter on 5 March 2021, alternatively until the date of the Vessel's delivery into the Substitute Fixture on 9 March 2021, (ii) damages for wrongful termination and (iii) recovery of related expenses.

23.   In response to the Claimant's Claim submissions, the First and the Second Respondents served a response to the Claim submissions.  In respect of the Second Respondent, all allegations were denied on the basis of the Tribunal's absence of jurisdiction as set out in the Objection to Jurisdiction.  From its side, the First Respondent admitted that the coal cargo had been delayed arriving in port and had not been available to load immediately, that the Second Respondent had made a payment of demurrage on its behalf, which payment had been a loan between them, and that it had indicated to the Claimant whilst the Vessel was at port that the cargo would be ready to load.

24.   In response to the First Respondent's reply to the Claimant's claims, the Claimant submitted that the First Respondent's statements amounted to no more than bare denials, devoid of any legal or factual content on which the Tribunal could find in the First Respondent's favour.

**Issues to be Determined**

25.   In accordance with the above, the issues to be determined by us are :

(i)     What was the legal effect of the Cancellation Message ?

(ii)    When did the Charter come to an end ?

(iii)   Is the Claimant entitled to demurrage ?  If yes, over what period and in what amount ?

(iv)   What was the legal effect of the demurrage invoices issued and the nature of the demurrage payments made to the Claimant ?

(v)    Is the Claimant entitled to damages for wrongful termination ?  If yes, how are damages to be calculated and to what amount is the Claimant entitled ?

(vi)   Is the Claimant entitled to recover its related expenses incurred at the loadport ?

**(i)     What was the legal effect of the Cancellation Message ?**
**Parties' Positions**

27.   It was the Claimant's position that the Cancellation Message amounted to wrongful termination of the Charter, which repudiatory breach it was entitled to accept and thus bring the Charter to an end.

28.   In reply the First Respondent submitted, without further explanation, that it had had the right to terminate the Charter, which it had done in accordance with the terms of the Charterparty.  This statement, the Claimant submitted, was a wholly inadequate pleading and a bare assertion in breach of the LMAA Terms.  In its contemporaneous correspondence of 5 March 2021 the Claimant described the First Respondent's message of 11 February 2021 as confirmation that *"[Respondents] cancel the Charterparty and will not perform their obligations going forward including to provide a cargo"*.

**Determination**

29.  On the basis of the submissions and documents before us, we accept the Claimant's submission and determine that the First Respondent's message evinced an intention not to perform its obligations under the Charterparty terms, in repudiatory breach, entitling the Claimant to accept that breach and terminate the Charter. By contrast, we see no basis for the First Respondent's submission that it was entitled to terminate the Charter, which submission we accordingly reject.

**(ii)   When did the Charter come to an end ?**
**Parties' Positions**

30.  It was the First Respondent's position that the Cancellation Message had brought the Charter to an end, whilst it was the Claimant's position that the Charter only came to an end at 0723 on 5 March 2021, when it accepted the Cancellation Message as a repudiatory breach of the Charter.

**Determination**

31.  Having determined at (i) above that the Cancellation Message did no more than evince an intention not to be bound by the Charter, entitling the Claimant to accept (or not) the repudiatory breach, it follows that we do not accept the First Respondent's submission that the Message had the effect of terminating the Charterparty on 11 February 2021.

32.  We accept the Claimant's submission that a repudiatory breach of Charter presents the innocent party with an election whether to accept the breach and terminate the Charter or not and that the innocent party has a period of time in which to make that election. Neither Party addressed us on the reasonable duration of that election period.

33.  On the basis of the submissions and documents before us, we accept the Claimant's submission that the Charter was terminated at 0723 on 5 March 2021, when it accepted the Cancellation Message as a repudiatory breach of charter and brought the Charter to an end.

(iii)    **Is the Claimant entitled to demurrage ?   If yes, over what period and in what amount ?**

**Parties' Positions**

34.    The Claimant submitted that, the Vessel having tendered NOR at 2035 on 3 January 2021, laytime commenced at 0835 the following day and that, taking into account allowed laytime of 2.4 days, the Vessel came on demurrage at 1811 on 6 January 2021.  Having terminated the Charter at 0723 on 5 March, this resulted in a total period of demurrage of 57.55 days which the Claimant claimed in the total amount of USD 920,800.  Alternatively, the Claimant claimed demurrage from tender of NOR on 3 January 2021 until delivery of the Vessel into the Substitute Charter on 9 March 2021, which it calculated resulted in damages of USD 1,026,288.80.  After allowance was made for the received payments of USD 199,980, this resulted in the Claimant's total claim for demurrage in the amount of USD 720,820 alternatively, damages of USD 826,308.80.

35.    The Claimant relied upon the contemporaneous documents to evidence its demurrage claim.  The First Respondent did not address the running or calculation of laytime or demurrage at the loadport but denied that the Claimant terminated the Charterparty on 5 March 2021 or that it was liable for demurrage beyond 11 February 2021, as had been invoiced.

**Determination**

36.    Clause 31 of the Rider set out the provisions agreed in relation to tender of NOR, commencement and allowed laytime as follows :

*"… Vessel to be loaded at the rate of 20,000 Metric Tons per weather working day of 24 consecutive hours, Saturdays, Sundays and holidays included, Charterers option to load at 25,000 Metric Tons….. Laytime shall commence 12 hours after the vessel tenders notice…..If the berth is not available on the Vessel's arrival, the Master may tender said notice from a lay berth or anchorage within the port limits."*

37.   The loadport SOF records that the Vessel first tendered NOR at 2035 on 3 January 2021.  However, the SOF also records that the Vessel only stopped to pick up a pilot and ended it sea passage at this point, weighing anchor shortly afterwards at 2240, at which point NOR was re-tendered.  It is trite law that tender of NOR at the end of sea passage, before a vessel anchors or berths, is premature and invalid.  We accordingly determine the NOR tendered at 2035 on 3 January 2021 was invalid and that the first validly tendered NOR at the loadport was that tendered at 2240 the same day.

38.   After allowance of the contractually agreed 12 hours turn time, we determine that laytime at the loadport started to run at 1040 on 4 January 2021 and, in the absence of any applicable interruptions or exceptions to laytime, that time ran continuously thereafter as laytime and then demurrage for the First Respondent's account.

39.   In circumstances where the reduced cargo quantity of 60,000mt arose from the First Respondent's instructions, we accept that this should be the cargo quantity on which allowed laytime is calculated.  As to the contractual load rate on which allowed laytime should be calculated, in circumstances where the First Respondent did not elect to load at the faster rate of 25,000mt pwwd, we determine that allowed laytime at the loadport should be calculated on the basis of the load rate of 20,000mt pwwd.  On the cargo quantity of 60,000mt, this equates to allowed laytime of 3 days.  Allowed laytime therefore expired at 1040 on 7 January 2021, at which point time on demurrage began to run.

40.   As to when time on demurrage stopped running, the evidence before us indicates that the Vessel left the loadport on the instructions of the USCG and returned on 9 March 2021 to enter into the Substitute Charter.  Pursuant to our determination at (ii) above that the Charter had been terminated on 5 March 2021 and following the authorities to which we have been referred, we determine that demurrage continued to accrue until 0723 on 5 March 2021.

41.   In accordance with the above, we determine that the total running time for which the First Respondent is liable is the period between 1040 on 4 January and 0723 on 5 March 2021.   This equates to a period of 57 days, 20 hours and 43 minutes, equivalent to 57.86 days.

42.   Taking into account the total allowed laytime of 3 days, we FIND that the First Respondent is liable for demurrage for a of 54.86 days.  At the rate of USD 16,000 PDPR agreed on nomination, this equates to loadport demurrage of USD 877,760.

(iv)   **What was the legal effect of the demurrage invoices issued and the nature of the demurrage payments made to the Claimant ?**
       **Parties' Positions**

43.   It was common ground that the Claimant had issued a series of demurrage invoices between 13 January and 11 February 2021 reflecting demurrage falling due day by day.  It was similarly common ground that two payments totalling USD 199,980 had been made to the Claimant on 20 and 28 January 2021 (by the Second Respondent on behalf of the First Respondent) and that the last invoice issued by the Claimant on 11 February 2021 indicated a balance due to the Claimant of USD 379,897.78 after allowance of the payments received.  This reflected demurrage up to that date.

44.   It was the Claimant's position that the payments received were part payments toward the total amount of demurrage claimed.  The First Respondent denied this, submitting instead that the payment had been made for *"the negotiated demurrage"*.  No further explanation, nor any supporting evidence, of that statement was offered by the First Respondent.

45.   In its Closing submissions the First Respondent, for the first time, objected to the Claimant's demurrage claim, beyond that amount invoiced on 11 February 2021, on the basis that no further demurrage invoice had been issued, the effect of which, the First Respondent submitted, was that the Claimant had waived its right to collect additional demurrage, issuance of an invoice being a condition precedent in the

contract.  In addition, it submitted, the Claimant's total claim should be limited by the plain terms of the contract to the amount invoiced on 8 February 2021.

46.     In its Closing submissions in Reply, it was the Claimant's primary position that the First Respondent's new argument raised in its Closing submissions should be disregarded as it was procedurally unfair for the First Respondent to raise a novel defence at that late stage.  Secondly, without prejudice to its primary position, the Claimant submitted that (i) the First Respondent's waiver argument could not amount to a defence of the balance of the invoiced demurrage or the Claimant's damages claims and (ii) that, in the absence of any time bar, the Claimant could, and if it had been on notice of this argument previously, would have issued a further invoice and/or made appropriate reference in its Claim submissions.  Alternatively, if needed, the Claimant could serve such a document headed invoice and commence another arbitration.   However, the Claimant submitted this was not necessary because (i) pursuant to paragraph 13 of the Recap and Clause 35 of the Rider, for demurrage to become payable all that was required was provision of supporting documents and the final freight invoice, not a final demurrage invoice and (ii) demurrage fell due pursuant to Clause 7 day by day.  Highlighting the distinction between 'due' and 'payable' and relying upon *Videocean Global Ltd v. Goldman Sachs International* [2016] EWCA Civ 130, the Claimant submitted that 'due' meant there was a legal obligation which had accrued in respect of an underlying debt and that in order for a sum due to become payable, all that was needed was for a demand to have been made, which, it submitted, had been made in Claim submissions served in April 2021.

**Determination**

47.     Although the First Respondent's submissions in relation to negotiated settlement are not entirely clear, to the extent it is the First Respondent's position that the part payment amounted to an agreed settlement of the Claimant's February demurrage invoices, this argument is rejected in the absence of any supporting evidence. Rather, the last invoice issued indicates on its face that a balance remains due.

48.   Otherwise, in relation to the nature of the demurrage invoices issued, it is evident from their face that they constituted interim invoices in respect of demurrage falling due day by day and we so determine.  We have determined at (iii) above the total amount of demurrage to which the Claimant is entitled.

49.   In circumstances where there was no discharge or final freight invoice issued, we construe paragraph 13 of the Recap and Clause 35 of the Rider to mean that demurrage became payable within 30 days of the termination of the Charter, provided that supporting documents had been provided.  We have determined at (ii) above that the Charter was terminated on 5 March 2021 and supporting documents for the final amount of demurrage claimed were provided at the latest on 26 April 2021.

50.   In accordance with the above, our determination at (iii) above is undisturbed by the First Respondent's negotiated payment and waiver arguments, which we hereby reject.

(v)   **Is the Claimant entitled to damages for wrongful termination ?   If yes, how are damages to be calculated and to what amount is the Claimant entitled ?**
**Parties' Positions**

51.   It was the Claimant's position that the First Respondent's repudiatory breach of Charter had entitled it to terminate the Charter and that damages flowing from the breach should be awarded in the usual way, demurrage continuing to accrue until termination.  We have dealt with the Claimant's entitlement to demurrage at (iii) above.

52.   As to how the quantum of its damages claim should be calculated, relying on _The Concordia C_ [1985] 2 Lloyd's Rep 55, _The Noel Bay_ [1989] 1 Lloyd's Rep 361 _Odfjell Seachem v Continentale Des Petroles_ [2005] 1 Lloyd's Rep 275, and _Louis Dreyfus Commodities v MT Maritime Management_ [2015] 2 CLC 508, the Claimant calculated its entitlement to damages for wrongful termination on the basis of the difference between the net earnings it expected to achieve under the Charterparty, less those

achieved under the Substitute Charter for the period the two overlapped. More particularly, the Claimant submitted that, following *The Noel Bay*, had the original voyage been performed from the date of termination on 5 March 2021, the Charterparty would have come to an end on or about 24 March, a duration of 19.24 days, and that net earnings (freight income less operating expenses) of USD 512,581.76 would have been achieved under the Charter at a daily time charter equivalent ("TCE") of USD 26,641.46. Relying upon the voyage report of the Substitute Charter, actual net earnings under that fixture from 9 March until redelivery on 5 May, a total duration of 57.06 days, were USD 488,108, resulting in a daily TCE of USD 24,641.46, i.e. USD 2,000 less per day.

53. On the above basis, the Claimant submitted that, had the original Charterparty voyage been performed, the Claimant could have expected to earn USD 512,581.76 up to 24 March 2021. As the Substitute Charter overlapped the expected duration of the Charterparty by 15 days (from 9 March to 24 March), the Claimant gave credit for the actual daily earnings under the Substitute Charter of USD 369,621.90 (USD 24,641.46 per day for the 15 day overlap), resulting in a net damages claim for wrongful termination of USD 142,959.86.

54. The First Respondent made no comment on the basis upon which damages for wrongful termination had been calculated, stating itself to be without sufficient information to admit or deny the allegations made.

**Determination**

55. Following the case law to which we have been referred, we accept the basis on which damages are to be calculated in principle, namely by assuming the breached fixture would have been performed immediately upon termination of the Charterparty, entitling the innocent party to recovery of its expected net earnings under the terminated charter, less any net earnings achieved under a substitute charter for any period of overlap, comparative calculations being achieved by the net earnings under each fixture being converted into TCE daily rates.

56.     On the basis of the documents before us, we can see that the Claimant went into the market from 16 February 2021 to seek alternative employment in mitigation of its loss of this Charter and there is no suggestion that the Vessel was otherwise employed between 11 February and 9 March 2021. We accordingly accept that the Claimant's claim for damages for wrongful termination in the amount of USD 142,959.86 as claimed.

**(vi)     Is the Claimant entitled to recover its related expenses incurred at the loadport ?**
**Parties' Positions**

57.     The Claimant claimed reimbursement of wasted port disbursement account costs in the amount of USD 41,576.07 and underwater cleaning costs incurred due to the extended period of waiting in the amount of USD 27,000, a total of USD 68,576.07.

58.     In relation to the wasted DA claim, the Claimant evidenced its claim by reference to a "Charterer's Disbursement Account" issued by the Agents dated 26 March 2021. This showed that the Claimant had paid advance DA of USD 103,713.17, incurred DA of USD 41,576.07 and was therefore entitled to a rebate of USD 62,137.10. The Claimant claimed the incurred DA from the First Respondent as wasted DA.

59.     In respect of the underwater cleaning costs, the Claimant relied upon two invoices dated 4 February and 11 April 2021 in the amounts of USD 8,000 and USD 19,000.00 respectively. Both invoices related to the services of Dockside Diving Inc of Hampton, Virginia, USA. The first invoice itemises inspection, propeller polishing and sea chest, and rudder cleaning costs. This invoice gives no indication of the date on which the services were provided, although the contemporaneous correspondence shows the services were arranged before the Vessel left port on 14 February 2021. The second invoice itemises inspection costs undertaken on 30 March 2021 and ship hull cleaning undertaken on 10 and 11 April 2021. The Claimant offered no further explanation as to why these later expenses should be for the First Respondent's account.

60.    The First Respondent put forward no specific defence to the Claimant's claims for loadport DA and underwater cleaning, stating only that it had insufficient information to admit or deny the claims and that the Claimant's claim should be limited to the amount set out in the Claimant's invoice (for demurrage).

**Determination**

61.    In the context of this voyage Charter, the Parties agreed that the First Respondent would pay freight which, pursuant to Clause 36 of the Rider, was to be inclusive of all port charges, labour dues etc on the Vessel, whilst any taxes, dues, wharfage on the cargo was to be for the First Respondent's account.  The Charter included demurrage provisions to deal with delay to the Vessel after expiry of the agreed laytime.

62.    In circumstances where the Claimant expected to be recompensed for port DA by the freight payment, but no freight ultimately fell due as a result of the First Respondent's breach of Charter, it follows that the Claimant is out of pocket in relation to the port DA incurred as a result of the First Respondent's breach of Charter.   We accordingly award the Claimant damages in the amount of USD 41,576.07 in respect of wasted loadport DA.

63.    In relation to the hull cleaning costs claimed, the Vessel remained idle at the loadport under this Charter for a period of approximately 40 days between 3 January and 11 February 2021.   We have no information in relation to the Vessel's movements after it left the loadport on 14 February until it returned on 9 March 2021, when it was delivered into the Substitute Charter.  Further, on the basis that the cleaning services referred to in the second invoice were undertaken at the loadport around a month after delivery into the Substitute Charter, these costs appear to relate to an idle period under the Substitute Charter in any event.

64.    This voyage Charterparty made no contractual provision for allocation of risk of hull fouling as between the Parties.  Rather, the Charter contained demurrage provisions to compensate the Claimant for delay at port by means of liquidated damages. Absent any explanation as to the basis on which the Claimant should be entitled to

recovery of hull cleaning costs caused by delay, over and above the liquidated damages agreed for delay, namely demurrage, we agree with the First Respondent that the Claimant's claim for related expenses arising out of delay should be limited to demurrage and the Claimant's claim in relation to the first invoiced hull cleaning costs of USD 8,000 fails accordingly.  Even if the Claimant were entitled to recover hull cleaning costs from the First Respondent in respect of hull fouling caused by delay under the Charter, in circumstances where the second invoiced hull cleaning costs of USD 19,000 appear to relate to delay under the Substitute Charter and are therefore unrelated to the First Respondent's breach, that claim fails in any event.

65.   In accordance with the above, we FIND the Claimant's entitlement to recovery of claimed related expenses of USD 68,576.07 succeeds in the amount of USD 41,576.07 only.

**Summary**

66.   In accordance with the above, we determine the Claimant's demurrage claim succeed in the amount of USD 877,760, the Claimant's damages claim succeeds in the amount of USD 142,959.86 and the Claimant's claim for related expenses succeeds in the amount of USD 41,576.07, resulting in a total award in the Claimant's favour of USD 1,062,295.93.

**Interest**

67.   The Claimant claims interest on the sums claimed.  In circumstances where the Claimant first provided the First Respondent with full details of its claims by 26 April 2021, we determine that the amounts claimed should have been paid within a reasonable time thereafter, namely 4 banking days, namely by 30 April 2021.

68.   We therefore award interest on the total sum awarded from 1 May 2021.  Pursuant to our discretion under Section 49 of the Arbitration Act 1996 ("the Act") we consider the rate of 5% (five percent) compounded at three monthly intervals to be an appropriate commercial rate for both pre and post award interest.

**Costs**

69. The Claimant was obliged to resort to arbitration to seek resolution of its claims and has been successful to the extent and for the reasons set out above.  Pursuant to our discretion under Section 61 of the Act, and following the usual rule that costs follow the event, we consider the Claimant to be entitled to recovery of its reasonable costs and disbursements incurred in this arbitration reference, such costs to be assessed by us in default of agreement, pursuant to Section 65(3) of the Act, together with reimbursement of the Tribunal's costs if paid in the first instance by the Claimant. Further, the Claimant shall be entitled to interest on those costs at the rate of 5% (five percent) compounded at three monthly intervals from the date such sums fall due.

**NOW WE**, the said Alan Oakley and Daniella Horton, having taken upon ourselves the burden of this arbitration, having carefully and conscientiously considered the submissions and the evidence provided to us, having given due weight thereto and finding ourselves in agreement for the reasons set out, **DO HEREBY MAKE, ISSUE AND PUBLISH** this our **FINAL ARBITRATION AWARD** as follows :

A.  **WE FIND AND HOLD** that the Claimant is entitled to recover from the First Respondent the amount of USD 1,062,295.93.

B.  **WE THEREFORE AWARD AND DIRECT** that the First Respondent shall forthwith pay to the Claimant that amount of USD 1,062,295.93 together with interest calculated at 5% (five percent) per annum and pro rata compounded at three monthly intervals from 1 May 2021 until the date of payment.

C.   **WE FURTHER AWARD AND DIRECT** that the First Respondent shall bear its own costs of this arbitration and shall bear and pay the Claimant's reasonable recoverable costs of this arbitration, to be assessed by us if not agreed, for which purpose the Tribunal hereby reserves its jurisdiction, together with compound interest at the rate of 5% (five percent) per annum and pro rata, compounded at three monthly intervals from 14 days after the date such costs are agreed, alternatively from 14 days after the date such costs are assessed by us, until payment.

D.   **WE FURTHER AWARD AND DIRECT** that the First Respondent shall bear and pay the Tribunal's costs of this Final Arbitration Award in the sum of £13,550 provided that, if in the first instance the Claimant shall have paid such costs or any part of them, the Claimant shall be entitled to immediate reimbursement from the Respondent, together with interest thereon at the rate of 5% (five percent) per annum and pro rata, compounded at three monthly intervals from the date of payment of such costs by the Claimant until the date of reimbursement by the First Respondent.

Given under our hands in London this 20ᵗʰ day of September  2022

Alan Oakley

Daniella Horton